# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| LACIE DAVIS, individually and on behalf of all others similarly situated, | 3:22-cv-03071-CRL-KLM |
| Plaintiff, | |
| - against - | Declaration of Spencer Sheehan |
| RICOLA USA INC., | |
| Defendant | |

Pursuant to 28 U.S.C.§ 1746, I declare:

1.      I am the attorney for Lacie Davis ("Plaintiff") in this action.

2.      I have personal knowledge of the facts in this Declaration, and could testify to their truthfulness.[1]

## I.      INTRODUCTION

3.      As this Court, other courts, and companies may be aware, I have filed numerous cases about consumer products over the past several years. [2]

4.      On May 7, 2024, I searched PACER for my first and last name and selecting "aty" corresponding to my role as an attorney.

5.      The results generated 749 cases, since December 2016, where I was the filing attorney or had some involvement, whether a notice of appearance, *pro hac vice* motion, or

---

[1] This Declaration is submitted in connection with Plaintiff's Memorandum of Law to be filed.

[2] Sarah Larson, The Lies in Your Grocery Store, New Yorker, Sept. 11, 2023; Andrew Court [real last name], I'm a Lawyer who Sues Over BS Food Labels – These are the Worst Offenders, NY Post, Sept. 19, 2023; CBS Sunday Morning, Jim Axelrod, "The lawyer who polices food labels," Video Interview, Nov. 19, 2023 ("these almonds never set foot in a smokehouse"); Inside Edition, Meet the Long Island Lawyer Pursuing Nearly 100 Lawsuits Over Products Labeled as 'Vanilla', Nov. 30, 2020; Will Dunn, The Vanilla Vigilante is suing capitalism, one product at a time, New Statesman, Sept. 17, 2023; Ken Schacter, Great Neck attorney has a taste for vanilla-flavored lawsuits, Newsday, October 2019 (dubbed "Vanilla Vigilante").

otherwise.

6.     This number does not include cases filed in state court or where I assisted other counsel in preparing complaints, in federal and state courts.

7.     The 749 entries contain numerous duplicates, because cases that were transferred, consolidated, and/or assigned to a Multidistrict Litigation ("MDL") may be counted multiple times.

## II.   MY CASES WITH ALLEGATIONS BASED ON INDEPENDENTLY DISCOVERED INFORMATION

8.     The cases presented below are those which include allegations that certain elements of product labeling is false and misleading, based on independent information I discovered.

9.     The facts in these cases are similar to what occurred in *Cowit*.

10.    The allegations in these cases are based on facts which typically could only be obtained through discovery, from third-parties, or industry experts.

11.    I provide this information to support my assertions that I independently learned that Defendant's menthol was likely sourced in India, notwithstanding its confirmation of this fact through the publicly filed, non-redacted Gafner Report.

12.    This selection is non-comprehensive, but I am confident it paints an accurate picture of the way I go about my work.

A. Discovery of Supplier Based on Ingredient List

13.    In June 2017, I filed an amended complaint on behalf of a plaintiff against Schwan's Consumer Brands, Inc., in the U.S. District Court, Eastern District of New York. *Leguette v. Schwans Company et. al.*, No. 17-cv-07599. Exhibit A.

14.    The subject of this case was the frozen pies sold under the Mrs. Smith's brand,

2

labeled as "Made With Real Butter."

15.     I alleged this was misleading because the main shortening ingredient was not butter but vegetable oils.

16.     I noticed that across different labeling of those products, "All the pie crust ingredients are identical, though their order has been rearranged slightly," because that defendant "separated the components of the vegetable shortening."

17.     Based on my knowledge of food processing, I surmised that "it is highly unlikely that any manufacturer fabricated such a product and delivered it to defendant for the products."

18.     I spent considerable time searching for suppliers selling combinations of butter and vegetable oil ingredients, and located "a product with the name 'Shortening Butter Blend' on a list of shortening ingredients that company provides to food manufacturers," Dien Inc., in Texas.

19.     I noticed Shortening Butter Blend had the code "89162," and I spent considerable time to find the origins of this code.

20.     I was confident that this code was unique because it was very unlikely it would appear on random, unrelated products.

21.     Ultimately, I discovered that this code "corresponds to the SKU for SunGlow® European Style Butter Blend (89162) from Ventura Foods LLC, one of the largest producers of shortenings in the country, and they describe this product as a 'cost-effective blend of margarine and butter.'" ¶ 54.

22.     For good reasons, I will not disclose whether my assumptions were accurate.

B.     <u>Discovery of Undisclosed Ingredients Based on Industry Practices</u>

23.     On October 26, 2018, I filed a case on behalf of a plaintiff against Small Planet Foods, Inc., a subsidiary of General Mills, in the U.S. District Court, Eastern District of New York.

*Evans v. Small Planet Foods, Inc.*, No. 18-cv-06009. Exhibit B.

24.   I alleged that "In reaction to consumers seeking foods without artificial ingredients, sugar in its myriad forms and preservatives, manufacturers have attempted to make products with as few ingredients as possible." ¶ 10.

25.   The Complaint alleged that the listed ingredients on the subject snack bars was misleading because it used "generic, collective names for ingredients," such as "Dates," even though they "were sitting on a warehouse shelf in a processed form, through the use of preservatives, until they were needed for the products." ¶¶ 19-20.

26.   To reach this conclusion, I spent many hours investigating the source of dates.

27.   This involved reading old materials about the origins of the date industry in California and Arizona.

28.   However, I learned that "domestic dates are limited in number relative to the global market and are consumed fresh."

29.   In contrast, "The largest producers of dates and date products are in the Middle East, North Africa and South Asia, who export them to other countries including the U.S."

30.   I read considerably about the processing of dates, including technical manuals, articles in academic journals, and academic treatises which discussed the production, harvesting, and processing of dates.

31.   I also closely reviewed export and import records which were publicly available, through third-party suppliers of US Customs data like Panjiva.

32.   Working backwards from what I believed the final product to be, "date paste," I confirmed that dates would likely be processed abroad, near where they were harvested.

33.   However, the literature revealed that "Storage of date paste brings challenges like

hardening, microbial spoilage, darkening in color and limited shelf-life of c. 30 days."

34.    The conclusion was inescapable, that "a small amount of citric or ascorbic acid is incorporated into the date paste to maintain a desirable color, prevent hardening, extend shelf-life and retard spoilage." ¶ 28.

35.    I learned this information without relying on consultants, experts, and certainly without any confidential materials provided through discovery, as this case was voluntarily dismissed prior to the defendant filing an appearance.

36.    The use of these added preservatives was relevant because the Complaint alleged they were "not exempt from being declared in the ingredient list."

37.    The implications alleged were that "the labels are misleading since they are omitting an ingredient which consumers would find less favorable than those promoted in their marketing," since it would be difficult to maintain the same type of "simple ingredients" marketing message if known chemicals were listed. ¶ 34.

38.    Additionally, this Complaint alleged that though it was technically true to promote these products as based on date fruits, it was also misleading.

39.    To support this conclusion, I noted that dates have close to the highest concentration of sugar and lowest water content of all fruits. ¶ 43.

40.    Next, I described how "The high sugar content of dates is the reason they have been valuable to the confectionery industry."

41.    In exploring this line of research, I continued to research global trade records and classification of dates based on the Harmonized Tariff Schedule ("HTS").

42.    I alleged that "Customs bureaus in this country and elsewhere classify products composed of the ingredients in these Products – date paste, nuts – as confections, not containing

white chocolate, as opposed to under the distinct categories for fruit or nut products." ¶ 50.

43.     As a result, "The emphasis on dates in the Products while promoting the bars as a 'fruit and nut bar' is the equivalent of classifying ketchup as a vegetable (as opposed to claiming that ketchup contains vegetables) – it is misleading and deceptive to consumers."

C.   Ingredient Information Inferred Based on Standards of Identity and Formulation

44.     On June 15, 2018, I filed a case on behalf of a plaintiff against Chicago Bar Company, LLC, in the U.S. District Court, Eastern District of New York. *Pizzirusso v. Chicago Bar Company, LLC*, No. 18-cv-03529. Exhibit C.

45.     The main allegations were that the promotion of the product based on containing "egg whites" was misleading.

46.     Plaintiff alleged that "Reasonable consumers are familiar with egg whites, since they are often consumed for their protein content," and that "Defendant capitalizes on this association."

47.     I concluded that "Defendant does not utilize egg white powder in its complete form, which would have entitled it to utilize the name 'egg whites' to refer to the subject ingredient."

48.     Rather, defendant utilizes one or more of the egg white fractions, but not the entire egg white, which is not consistent with the requirements that egg whites refer to the liquid egg albumen separated from yolks, adequately treated and modified for its intended purpose (pasteurization to destroy bacteria, whipping aids if necessary)."

49.     I arrived at these conclusions after performing a significant amount of independent research.

50.     First, I identified egg whites as a food subject to an FDA "standard of identity."

51.     I researched the legislative history promulgating the standard of identify for egg whites, by reading the relevant sections of the Federal Register.

52.  Among other things, this discussed the purposes for which egg whites were used, "in "whipping" things like batters, meringues, etc. This ability to aid in air entrapment is invaluable in aerated food systems."

53.  Second, I studied the food science literature about the incorporation of egg whites into finished food products. ¶ 23.

54.  I learned that the "different proteins are present in varying amounts and can perform different functions when separated from the egg white."

55.  Third, I performed internet searches to identify the identical product when it had different labeling.

56.  This confirmed my suspicion that this product likely used "egg white protein powder."

57.  The conclusion drawn was that "It is not possible for the Products to contain 'egg whites' as that term is understood by consumers and regulations because the foaming properties of egg whites would limit the ability to blend it with the other ingredients." ¶ 29.

58.  This was relevant to consumer deception, because purchasers "would not be as drawn to a product which boldly promoted the presence of 'Egg White Protein Powder," and "parents correctly wouldn't want to buy their young children foods which contained concentrated protein powders, for a variety of reasons related to normal adolescent and child development."

59.  This Complaint also advanced similar arguments based on the labeling of the fruits used in this product.

60.  I alleged that "the fruit pieces incorporated into the Products are 'infused' (flavored) with sweetening agents such as apple juice concentrate, contrary to defendant's labels and messaging which emphasize 'real fruit' to provide flavor."

61.    The Complaint did not extensively focus on this issue.

62.    However, I arrived at those conclusions based on my knowledge of how such fruits were processed in the industry.

D.  Aluminum Foil "Made in USA" Misleading Based on Raw Material Availability

63.    On January 17, 2022, I filed a case on behalf of a plaintiff against Reynolds Consumer Products LLC, in the U.S. District Court, Northern District of Illinois. *Shirley v. Reynolds Consumer Products LLC*, No. 22-cv-00278. Exhibit D.

64.    I learned of this deception through the equivalent of a "eureka" moment which I have shared with certain friends and colleagues.

65.    I generally don't publicly disclose these stories, but do so since it is relevant to defending myself against false and malicious allegations.

66.    I came across a discarded box of Reynolds Wrap aluminum foil on the basement recycling table of the building where I live.

67.    Since much of my life and time is spent with labeling, I am often able to zero in on something that may potentially be misleading or which warrants further investigation.

68.    These are things which others may not notice or just accept at face value.

69.    In this circumstance, I was drawn to the "FOIL Made in USA" claim on the front.

70.    I immediately noticed this statement purported to be sufficiently qualified with respect to the foil being made in the USA, i.e., being manufactured here, even though the raw materials may not have been.

71.    I knew that such a statement was contrary to the rules of the Federal Trade Commission ("FTC") with respect to "Made in USA" claims, because of their tendency to mislead consumers.

72.    However, I did not have any "proof" that the raw materials used in the Reynolds Wrap aluminum foil was obtained from countries other than this one.

73.    I did what I often do in these circumstances, which is to begin researching.

74.    I have attached certain search queries I performed based on my suspicion that the raw materials used for the Reynolds Wrap aluminum foil were obtained from non-domestic sources. Exhibit E, Google Search Activity, January 15 to January 17, 2022.

75.    Though this Complaint was filed on January 17, 2022, my records do not reflect research I conducted prior to January 16, 2022.

76.    The first search I performed was for "aluminum foil" "made in usa."



77.    I also searched "aluminum foil" raw materials.

78.    This led to the knowledge that bauxite was the raw material for aluminum foil.

79.     One very informative document I located was from the International Trade Administration ("ITA"), part of the Department of Commerce.

80.     These types of trade documents are highly useful and I have encountered them with respect to all manners of raw materials.

81.     My queries continued as I learned more information.



82.     A short time later, the *Shirley* Complaint alleged that "In 2013, the US mined 1.3 percent of the bauxite it used, less than 0.1 percent of world production."

83.     Further, "US-mined bauxite is used for abrasives, high-temperature refractory materials, and as a high-strength proppant for hydraulic fracturing of oil and gas wells."

84.     I identified "The largest suppliers of bauxite for aluminum include Australia, Guinea,

India, Brazil, Jamaica and Vietnam."

85.   Plaintiff here alleged that "[she] did not expect a product, especially from the Reynolds brand, would promise it was "Made in U.S.A." even though all of the raw materials used were from outside of the United States."

86.   I gathered this information without discovery, without reliance on outside experts, and without any internal documents of the company this case was filed against.

87.   That defendant's motion to dismiss was denied, because the complaint's allegations were "sufficient to nudge plaintiff's claims 'across the line from conceivable to plausible.'" *Shirley v. Reynolds Consumer Prod., LLC*, 636 F. Supp. 3d 907, 913 (N.D. Ill. 2022) quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009) quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

88.   While I am unable to confirm or deny whether the allegations in *Shirley* have been proven true, it should be noted that at no time did Reynolds reasonably dispute the basis for those allegations, nor has it made any motions related to those facts being incorrect.

E.   Knowledge of Lemon Juice Processing Basis for Claims of Deception

89.   On December 13, 2018, an amended complaint prepared exclusively by me, and on a case where I was an attorney, was filed The Hain Celestial Group, Inc. and Hain Blueprint, Inc., in the U.S. District Court, Eastern District of New York. *Davis v. The Hain Celestial Group, Inc. et al*, No. 17-cv-05191. Exhibit F.

90.   Relevant here are the allegations that the use of lemon juice resulted in it being "false and misleading to describe the Cold Press Juice Products as 'raw.'"

91.   The reasons for this conclusion were several.

92.   First, I investigated the production of citrus juices.

93.   This involved consulting federal regulations, trade publications, ITA documents,

11

academic treatises, and industry literature.

94.   I concluded that "Citrus juices are not obtained through a cold-press in the same way juice from pome fruit (apples, pears) or stone fruit (peaches, plums)" due to technological and economic reasons involving the processing of citrus fruits.

95.   Second, I concluded that "It is probable that defendants use lemon juice from third-parties" for several reasons relating to the efficient use of all aspects of the lemons, not just juice.

96.   This requires a full scale operation with equipment and scale which would not be economically feasible for one company.

97.   Third, because "Lemon juice has a standard of identity," it was required to be made and processed in a very specific way, which was inconsistent with the way the juice products at issue were represented, i.e., "Cold Pressed" and "Raw."

98.   While that court dismissed several of those claims, it held "plaintiff's theories relating to the alleged heat processing of lemon juice may proceed." *Davis v. Hain Celestial Group, Inc.*, 297 F. Supp. 3d 327, 334 (E.D.N.Y. 2018).

99.   I made these allegations without any discovery or documents provided by those defendants.

100.  Nor was I told this information from anyone employed or connected to those defendants.

F.   Sources of Stearic Acid Used to Allege "Made in USA" Misleading on Barbasol Shaving Cream

101.  On February 8, 2024, a complaint prepared by me, and where I was initially listed as an attorney, was filed against Perio, Inc., the maker of Barbasol shaving cream, in the U.S. District

Court, Middle District of Florida. *Rivera v. Perio Inc.*, No. 24-cv-00371. Exhibit G.[3]

102.   I learned of this issue in a slightly different way from how I learned of the Reynolds Aluminum foil.

103.   I believe I may have had a can of Barbasol shaving cream for personal use where I live.

104.   While this is not the main shaving cream I use, I sometimes keep a can as a backup when I run out of my preferred brand.

105.   I don't recall when I first noticed the "Made in USA" claim on the front label, but it was likely at least six months prior to this Complaint being filed.

106.   When I first noticed the "Made in USA" claim, I considered that it purported to be "qualified," because I would not doubt that the ingredients were transformed into the shaving cream in the United States.

107.   I then checked the ingredients and saw "stearic acid" was the most predominant ingredient after water.

108.   Since I have filed many cases about personal care products which focused on their ingredients, I knew "stearic acid" was commonly used to refer to a derivative of palm oil.

109.   Palm oil has been relevant in many cases I have filed, which is not surprising, since it is believed to be in a high percentage of all consumer goods.

110.   Based on review of my Google search records, I began to research the origins of stearic acid not later than January 27, 2024. Exhibit H, Google Search Activity for stearic acid.

111.   One of my first searches on or after this date was "stearic acid" personal care products

---

[3] The reason why I filed or caused to be filed a withdrawal of a pending *pro hac vice* motion was because of a requirement limiting attorneys to a set number of such admissions per year. While I am unsure how many cases I have where I am admitted *pro hac vice*, I generally find the process of preparing such applications to be cumbersome, inconsistent, and inconvenient, especially where a case is at an early stage.

"sources."

112.  I progressively followed up with more expansive and targeted searches, such as global stearic acid production

113.   A sample of such searches is shown below and includes "stearic acid" commercial production "raw materials"



114.  By the time I prepared this Complaint, I had my basic theory and sufficient facts to support the allegations that the stearic acid in the Barbasol shaving cream was not derived from raw materials sourced in the United States.

115.  First, I learned that "Stearic acid is obtained from animal and plant sources."

116.  This was relevant, because the United States mostly produces stearic acid from animal sources.

117.  Second, I learned that plant sources of stearic acid could include soybean oil.

118.  Though the United States produces soybean oil, its use for stearic acid was not likely based on (1) the amount of acreage required for palm oil equivalent, and (2) its diversion to sources like biodiesel fuel.

119.  Third, I reviewed global export documents from third-party websites which identified countries by the relative amounts of stearic acid they supplied to world markets.[4]

120.  Fourth, I located a document that stated how many companies in the United States produce stearic acid.

121.  Unfortunately, that document did not identify the companies, but it did indicate where they were located.

122.  I used this information to "reverse search" for these companies and see what I could learn based on publicly available information.

123.  For example, "in producing stearic acid, the non-tallow raw materials used by Twin Rivers Technologies, a Massachusetts firm, are almost exclusively coconut oil and palm oil, with a sliver allocated to soybean oil, capable of being produced domestically." ¶ 38.

124.  Another company I identified was VVF LLC, which "promotes its line of fatty acids like stearic acid as 'Derived From Palm Oil, Palm Kernel Oil and Mustard Oil.'"

125.  I did the same thing for the other companies, such as "PMC Biogenix, Emery Oleochemicals and Vantage Oleochemicals, global producers with factories in Ohio, Illinois, and Massachusetts, manufacture various types of stearic acid."

126.  While I identified one domestic company producing stearic acid from soybean oil, I concluded it was unlikely this was the stearic acid used in Barbasol.

127.  This was because it was marketed as a food additive and not for personal care

---

[4] https://oec.world/en/profile/bilateral-product/stearic-acid/reporter/idn

products.

128.  Lastly, but most simply, I concluded "it is commercially challenging, if not impossible, to source significant amounts of consistent quality and low-priced palm oil-free stearic acid."

129.  I learned the origins of the stearic acid in Barbasol shaving cream without any documents provided to me by that defendant, any former employee or contractor of defendant, and without the assistance of any "expert."

G. Fake "San Marzano" Tomatoes

130.  On July 5, 2019, I filed an amended complaint on behalf of a plaintiff against Cento Fine Foods, Inc., in the U.S. District Court, Eastern District of New York. *Sibrian v. Cento Fine Foods, Inc.*, No. 19-cv-00974. Exhibit I.

131.  The Complaint alleged that this company's tomatoes were not authentic San Marzano tomatoes.

132.  It was alleged that the certifying entity did not certify such products, based in part on public records I reviewed, including their own website.

133.  Additionally, I noted discrepancies in how that defendant described another certifying entity with respect to their role in certifying the subject tomatoes.

134.  I relied on Defendant's own website and purported "find my field" feature based on the entry of can information.

135.  I discovered that "entry of "lot codes" into the website brings back the same four fields, over and over."

136.  The result was that "It is implausible that defendant can sell more San Marzano tomatoes than all other companies in the US, combined, and do so by cultivating only four fields."

137.   I recall that when I performed searches, I adjusted my browser settings to simulate if I were in Italy, to bring back higher quality results.

138.   Among other findings, I learned that Cento initiated its "self-certification" after being targeted by the Carabinieri, the Italian Police. ¶ 137.

139.   The pace of justice in Italy must be slow, because only in 2019 did an Italian tribunal find the perpetrators guilty for, among other things, leading investigators to "false fields" of tomatoes which were different than those sold to the public. ¶¶ 141-42.

140.   Though that court dismissed the action, there was no credible dispute or question that the information in the Amended Complaint was accurate.

141.   Moreover, a motion to dismiss a copycat case filed by other attorneys in California was denied, based on the work and investigation I performed. *Sibrian v. Cento Fine Foods, Inc.*, No. 19-cv-0974, 2020 WL 3618953, at *1 (E.D.N.Y. July 2, 2020) *but see Snarr v. Cento Fine Foods Inc.*, No. 19-cv-02627, 2019 WL 7050149, at *4 (N.D. Cal. Dec. 23, 2019).

H.   New Mexico Chili Peppers

142.   In May and June of 2023, I filed two cases where plaintiffs alleged the chili peppers sold by defendants were marketed in a manner deceptive to consumers. *Reyes v. Badia Spices, Inc.*, No. 23-cv-03607, U.S. District Court, Eastern District of New York and *Salvaggio v. McCormick & Company, Incorporated*, No. 23-cv-06334, U.S. District Court, Western District of New York. Exhibit J.

143.   In *Badia*, the allegations were based in part on that company's website, which identified the "Country of Origin" as Mexico, a far cry from the authentic New Mexico chili peppers promised to consumers.

144.   In *Salvaggio*, there was not an equivalent "smoking gun" like in *Badia*, which is why

that complaint relied on several supported inferences.

145.  First, the front label contained "not the New Mexico Certified Chile Certification Mark, but a self-designated indication describing it as "authentic."

146.  Second, "neither El Guapo or McCormick are registered as licenses with the NMCA."

147.  Third, extensively reviewed "customs import data reveals Defendant and/or its subsidiaries import large volumes of chili peppers of the type that are often sold as "New Mexico" chili peppers."

148.  Finally, I relied on my knowledge of customs and agricultural regulations to pick up on the disclosure that the Product was "Packed in USA," which was suspiciously vague and more appropriate for a product that is assembled from chili peppers grown in a variety of places besides one specific place, New Mexico.

## III.   HOW I LEARNED DEFENDANT'S MENTHOL WAS FROM INDIA

149.  Since I have filed hundreds of cases about flavoring, I knew that menthol was one of the most important flavoring compounds.

150.  This meant I spent considerable time researching it.

151.  Additionally, I have filed numerous cases about menthol lozenges, including against companies other than Defendant, like Procter & Gamble, Publix, Mondelez Global LLC, and possibly others.

### A.  My Search History for Menthol

152.  A search of my Google account reveals that I have records of researching menthol since July, 2021. Exhibit K, Google Activity Search for menthol from December 1, 2018 to December 10, 2023.

153.   One of the items listed in my search history is a chapter in the seminal work by Brian M. Lawrence, Mint, entitled, "Natural and Synthetic Menthol."

154.   I have possessed and read from this book for several years on various occasions.

155.   On July 26, 2021, my Google search history reveals I visited two sources which prove my prior knowledge of India as the source of most natural menthol, over a year before this action was even filed.



156.   At 12:05 AM, I visited the article, "Synthetic influx Synthetic menthol threatens the livelihoods of 400,000 families of farmers who grow Mentha."[5]

---

[5]  Karnika Bahuguna, Synthetic influx Synthetic menthol threatens the livelihoods of 400,000 families of farmers who grow Mentha, Down to Earth, Nov. 15, 2016.

157.   This article was from the website, "Down To Earth," a publication based in India.

158.   This article identified "India's position as the world's largest producer and exporter of natural menthol."[6]

159.   The article also notes that "More than 80 per cent of the country's natural mentha oil is produced in Uttar Pradesh, followed by Punjab, Bihar, West Bengal and parts of Uttarakhand and Madhya Pradesh," which is similar to what the *Cowit* action alleges.

160.   The second site, visited at 12:07 AM, was a page on ResearchGate, a repository for academic publications.

161.   The page I visited corresponds to the leading mint treatise by Lawrence, and the chapter, "Natural and synthetic menthol."[7]



162.   The "Abstract" of this chapter states that "Natural menthol is obtained by freeze

---

6   Karnika Bahuguna,
Published: Tuesday 15 November 2016
7   ResearchGate, Hopp, R., and B. M. Lawrence. "Natural and synthetic menthol." Mint: the genus Mentha. CRC, Boca Raton 389 (2006).

crystallization from crude corn mint oil. Although the oil has been produced in a number of different countries, the major corn mint oil producers are India and China."

163.  On August 19, 2022, my records show that I "visited GC-IRMS: Differentiating natural and synthetic sources of menthol by carbon and hydrogen isotope fingerprints," a technical paper published by ThermoFisher.[8]



164.  This article discussed how to "Trace the origin of menthol using carbon and hydrogen isotopes."

165.  Relevant here is that it stated how "menthol price and availability fluctuate depending on the climate conditions which influences the economy of the major producers of mint oil in the world, India (80%), China (9%), Brazil (7%), and the US (4%)."

166.  As demonstrated by my search history, I visited the same pages multiple times over many months.

167.  The image below shows I visited the Wikipedia page for menthol, which identifies

---

[8]  Mario Tuthorn et al., GC-IRMS: Differentiating natural and synthetic sources of menthol by carbon and hydrogen isotope fingerprints, Application Brief 30674, ThermoFisher Scientific.

how its source crop "is primarily grown in the Uttar Pradesh region in India."[9]



168.  On July 7, 2023, I visited the article, "An Aroma Chemical Profile: Menthol," in the

trade journal Perfumer & Flavorist.[10]



169.  This article mentions "India" nine times which a basic "Control + F" search confirms.

[9] Wikipedia contributors. "Menthol." Wikipedia, The Free Encyclopedia. Wikipedia, The Free Encyclopedia,

[10] George S. Clark, An Aroma Chemical Profile: Menthol, Perfumer & Flavorist, April 6, 2016.

170.   I could go through my search history, site by site, article by article, to make the same points, but I believe it has been made sufficiently.

B.   Gafner Report Discloses Indian Supplier of Menthol for Swiss Alpine Herb Lozenges

171.   Even though the Gafner Report was provided by Defendant several months earlier, I read it for the first time on December 6, 2023 in connection with responding to Defendant's Motion for Summary Judgment.[11]

172.   My Google history shows a search for "sharp mint india" at 8:02 PM followed by a visit to that company's website.



173.   Having seen the supplier's name for the first time in the Gafner Report, I could not "forget" my prior knowledge that India was the world's main source of menthol.

174.   I knew Sharp Mint would be an Indian company before I googled it partly because the "Ltd" designation is similar to how British companies are often identified.

175.   Since India and Britain have a long historical relationship, this makes sense.

---

[11] The events leading up to my reading the Gafner Report are described in the following section.

176.   It was a natural thing for me to rely on knowledge I had already acquired and apply that knowledge to new information.

177.   However, even if I had not read extensively about the sources of menthol, that "Sharp Mint" was an Indian supplier of menthol does not even require a full Google search.

178.   I demonstrated this yesterday, typing only "Sharp Mint," in an empty account which would not apply information based on my prior Google activity.

179.   Google's Autocomplete feature "makes it easy to finish entering your search on these topics without typing all the letters. The predictions change in real-time in response to each character being typed into the search box."[12]



180.   Even if I knew nothing about India's connection to menthol and how Defendant uses menthol from India in its "Swiss Alpine Herb" lozenges, Google's Autocomplete feature would

---

[12] Jess Peace, How Google Autocomplete works, Search Engine Land, Dec. 23, 2022.

have told me this by merely typing in "sharp mint."

181.  Since the selections provided appear to key the user in on the option that Google believes is relevant, it would be easy to make the connection between the Sharp Mint disclosed in the Gafner Report and India.

## IV.   FORMAL DISCOVERY IN THIS ACTION

### A.  Issuance of Discovery Demands

182.  On or around September 23, 2022, my office issued Plaintiff's First Set of Requests for Production of Documents, Electronically Stored Information and Tangible Things Pursuant to Rule 34 ("Request for Production" or "RFPs"), to Defendant.

183.  RFPs 9, 21, and 24, sought information related to the suppliers of ingredients used in the Product.

184.  On November 29, 2022, Defendant responded to the RFPs with boilerplate objections. Exhibit L.

185.  On December 1, 2022, the Court entered a Protective Order ("Order") "governing confidential and private material obtained in this case." ECF No. 18.

186.  On March 22, 2023, Defendant provided responsive documents pursuant to the Order.

### B.  Office Practice Related to Receipt of Discovery Materials

187.  As a matter of office policy, personnel are instructed to promptly download discovery documents and place them in the correct location.

188.  This is because sometimes download links may expire or require reauthorization.

189.  As a general practice, my interest in discovery materials is limited.

190.  I know many attorneys like to make a fuss about discovery, but I believe this is often

done to score "technical" points or to try and impose "pain," through burdensome work.

191.  My approach to consumer fraud cases is not informed by experiences working at a large law firm, where such tactics may be taught and encouraged.

192.  I came to consumer fraud cases without such experiences.

193.  The result is a clear realization of what is required to succeed.

194.  Following an initial dispositive motion, a plaintiff needs to certify a class.

195.  Since I generally have been pleading only consumer fraud statutes, which do not require intent, it will not typically matter what documents in a defendant's possession say.

196.  If I were seeking to certify a class based on fraud, it would be a different story, but typically I am not doing this.

197.  It is an inefficient use of the time of me and the attorneys in my office to review discovery materials unless necessary.

198.  This is usually part of the summary judgment process, where a defendant will cite its documents for various purposes.

199.  I am aware that in many circumstances, attorneys might review discovery documents prior to deposing a Fed. R. Civ. P. 30(b)(6) representative.

200.  While my office noticed a deposition in this action, it was withdrawn and we did not depose anyone.

201.  In a proposed consumer class action about deceptive labeling, the most important, and perhaps the only relevant thing, is the label itself.

202.  My approach can be confirmed by viewing the docket of cases where I am an attorney directing any litigation, and see the complete absence of discovery disputes initiated by plaintiffs.

C.  <u>My Initial Review of Gafner Report</u>

203.  Though the Gafner Report was served by Defendant months earlier, it was of no significance to my work on this case until presented in support of Defendant's Motion for Summary Judgment.

204.  Based on an internal email from an attorney here, and likely based on my oral instructions, the Gafner Report was emailed to me and Daphna Havkin-Frenkel, Ph. D., a flavor expert and scientist, on the morning of December 6, 2023. Exhibit M.

205.  I knew that the deadline to respond to Defendant's Motion for Summary Judgment Motion was fast approaching, and I wanted to have a copy of the Gafner Report to read on my phone.

206.  During that day, I quickly reviewed the Gafner Report on my phone, having not reviewed any of Defendant's discovery documents.

207.  As I reviewed the report, I breezed through the first nine pages, since this included the expert's background, experience, and basic information about menthol and flavoring I was already aware of.

208.  Page ten at paragraph 28, "The Menthol in the Product," was where I began to read slower.

209.  I recognized the long numbers as being "Bates Numbers," corresponding to discovery documents we presumably had been provided with.

210.  I was quite surprised to see the menthol supplier for Defendant identified as "Sharp Mint Ltd."

211.  I knew, from my experience in numerous consumer products cases, that supplier information is often highly protected.

212.  I later suspected that the Gafner Report was filed inadvertently on the public docket

and/or without any redactions.

213.  I thought to myself, "Why would a defendant seek to defend itself in a case about misleading 'Swiss Alpine Herbs' by publicly identifying its products as made from ingredients obtained from India?"

214.  There was no other rational explanation for this I thought.

215.  When I was writing the opposition to the Motion for Summary Judgment, I then identified and reviewed the discovery documents relied on by the Gafner Report, so I could make this argument not based on a google search but based on the discovery documents.

216.  I believe it would have seemed "unlawyerly" to have said, "I googled Sharp Mint Limited" and the main ingredient in Defendant's Swiss Alpine Herbs lozenges was from India.

217.  When I filed Plaintiff's Opposition Brief, I was cautious to publicly include mention of "India" because I suspected that maybe the Gafner Report was filed inadvertently without redacting the supplier's name.

218.  This is why my office provided this Court "an unredacted copy of Plaintiff's Memorandum in Opposition to Motion for Summary Judgment. Pursuant to Central District of Illinois Local Rule 5.11(B), the Clerk shall file the document under seal. A copy shall be provided to Defense Counsel. (GL) (Entered: 12/15/2023)." ECF Text Entry, December 14, 2023, ECF No. 40, +++ SEALED DOCUMENT - Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment - UNREDACTED.. (GL) (Entered: 12/19/2023).

219.  It is also supported by my emails to Defendant's Counsel after I finished the brief:

> In the filed version I redacted one or two sentences. I'm surprised your expert report listed as for attorneys eyes only is freely available on the docket and not sealed or redacted.
>
> I bring this to your attention perhaps that was intentional it's not my place to decide that. But if you'd like to seal It or anything that is fine. If anything in the brief I filed you feel

should be sealed or redacted please tell me I'll do so
promptly and notify court.

Thanks.

Exhibit N.

220. The next day, I emailed again and wrote, "I thought maybe bc it says attorneys eyes only on gafner report maybe was it filed on public docket in error."

221. Only recently, when Defendant made these false allegations against me, did I have reason to look again at the Gafner Report.

222. I incorrectly read the title and now see that it only referenced AEO and Confidential Information, but did not intentionally or purport to disclose any such information.

223. When I decided to prepare the *Cowit* Complaint, it was based on independent knowledge that menthol is sourced mostly in India.

224. Even though this information was publicly confirmed by Defendant in the Gafner Report, I was careful to not include any references to that, even though this would have been acceptable.

225. By the time the *Cowit* action was filed, the Gafner Report had been on the public docket for several months.

226. I even pointed it out to Defendant and took great care in handling what I believed to be confidential information that was inadvertently disclosed.

227. However, Defendant took no steps to seal or restrict the filed Gafner Report.

228. While I still had enough facts and inferences to allege Ricola used menthol from India, even without knowing the supplier from its publicly filed Expert Report, just like I did in numerous other cases, it was ancillary that this information was confirmed through publicly available materials.

## V.   MY ATTEMPTS TO ASSUAGE DEFENDANT'S UNJUSTIFIABLE DEMANDS

A. *Cowit* Allegations About Defendant's Swiss Alpine Herb Lozenges Based on Menthol from India

229.  In contrast to other scenarios which may superficially seem similar, at no point in *Cowit* was there any reference to the disclosure in the Gafner Report, which confirms that the menthol used in its Swiss Alpine Herb lozenges was from India.

230.  This was intentional, because I did not want to cause difficulty for Defendant's Counsel, who up until this Motion for Contempt, has treated me fairly.

231.  The claims in the *Cowit* Complaint involve "made with" claims coupled with misleading origin claims, which is great match and interesting.

232.  In preparing the *Cowit* Complaint, I performed new and separate research related to the production of menthol in India.

233.  My Google Activity search indicates that I began to perform significant research related to the issues in the *Cowit* action on March 23, 2024. Exhibit O, Google Activity History, searches and websites visited related to menthol, March 23, 2024 to April 18, 2024.

234.  This independent research, unconnected to any information disclosed, whether publicly or not, in this action was the independent basis for the *Cowit* allegations.

B. Counter-Proposals to Address Defendant's Concerns

235.  I sought to be responsive and to accommodate any legitimate concerns Defendant presented with respect to the *Cowit* action.

236.  I did this not because its arguments had merit, but because it is usually better to compromise.

237.  I also realized Defendant's Counsel was responsible for failing to properly redact or seal the Gafner Report, so I was willing to try and accommodate them and prevent possible

negative repercussions against them.

238.   Plaintiff's attorneys like me do not get paid by the hour and have little incentive to engage in unnecessary motion practice.

239.   My proposals to Defendant were reasonable, because it would have involved joint efforts to potentially modify the *Cowit* Complaint, with of course, as required by relevant rules, the attorney who filed that action.

240.   Had this proposal been considered by Defendant, I envisioned a collaborative review of *Cowit* to possibly qualify allegations with respect to its use of menthol from India in its Swiss Alpine Herb lozenges, emphasizing such allegations were on information and belief, and/or the investigation of counsel.

241.   I would have considered this compromise acceptable even though those allegations were not based on information and belief, but based on the facts disclosed in the Gafner Report.

242.   While I could have provided Defendant the type of declaration I am providing here, I was not given enough time to do so prior to its filing its Contempt Motion.

243.   I also proposed neutral third-party mediation.

244.   Moreover, I believe that any action short of giving in to its demands would not have been accepted.

245.   From the outset of those discussions, Defendant's Counsel's actions towards me were bullying in nature.

246.   I believe Defendant's Counsel is seeking to hold me in contempt to deflect from its own failure to redact or seal the Gafner Report, notwithstanding the *Cowit* allegations could have been made even if this case were never filed.

247.   Even if this action were never filed, it is likely I would have filed an action with the

31

allegations in *Cowit*, because looking at products for potentially deceptive labeling to consumers is what I do.

248.   I believe Defendant and its Counsel are seeking to hold me in contempt and seeking the forced dismissal of the *Cowit* action not for a lawful or legitimate purpose, but so it will not have to answer for the deception with respect to its labeling as alleged there.

249.   At no point did attorney Levin-Epstein view any documents produced in this action.

250.   Attorney Levin-Epstein has no involvement in this action and I have never discussed this action with him.

251.   I never shared the Gafner Report with attorney Levin-Epstein, even though it is a publicly filed document, which discloses the active ingredient in Defendant's Swiss Alpine Herbs lozenges is from India.

252.   I included attorney Levin-Epstein initially on the email with Defendant's Counsel because he was the attorney who filed the *Cowit* action.

253.   It is contrary to commonsense and obligations of professional responsibility that an attorney take actions on behalf of persons they represent, without knowing why.

254.   Defendant was demanding that I take immediate action to dismiss the *Cowit* action, so it was reasonable that the filing attorney be informed of such a demand.

## VI.   MY CONDUCT WITH RESPECT TO PROTECTIVE ORDERS

255.   I have always been diligent and very careful about violating protective orders.

256.   This can be confirmed from my actions here.

257.   When I believed Defendant may have unintentionally filed the Gafner Report without sealing or redactions, I promptly notified Defendant.

258.   I also refrained from filing plaintiff's unredacted brief which mentioned the

menthol's source as India.

259.   I normally would not seek to brag about my actions, but it is relevant since I am being accused of wrongdoing.

260.   As many people who have observed my cases know, I have enough things to worry about, with respect to courts dismissing cases I have filed because they may disagree with whether the claims at issue could mislead a "reasonable consumer."

261.   I will file cases which some may contend are not supported, but at no times have I not played by the rules.

262.   Given that my actions are closely scrutinized, this is necessary, notwithstanding it is the appropriate way to act as a person and attorney.

263.   The last thing I would want to do is give defendants and courts new and different grounds to challenge my practice of law.

264.   I have always taken pride in the originality of the legal theories I have advanced, even though they are often not successful.

265.   In researching the issues for the *Cowit* complaint, I did not rely on any of the materials supplied by Defendant.

266.   If I had to resort to using information obtained without permission or in violation of court orders to file a case, it would mean I did not think of the case on my own, or that I "cheated."

267.   Notwithstanding the professional and ethical obligations to avoid violating such orders, I would not want to sacrifice the originality and creativity of my work by cheapening it through using things I am not permitted to use.

268.   I request the Court deny Defendant's Motion.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   <u>May 10, 2024</u>

<u>/s/ Spencer Sheehan</u>
Spencer Sheehan

**Certificate of Service**

I certify that on May 10, 2024, I served and/or transmitted the foregoing by the method below to the persons or entities indicated, at their last known address of record (blank where not applicable).

|  | CM/ECF | First-Class Mail | Email | Fax |
|---|---|---|---|---|
| Defendant's Counsel | ☒ | ☐ | ☐ | ☐ |
| Plaintiff's Counsel | ☒ | ☐ | ☐ | ☐ |
| Courtesy Copy to Court | ☒ | ☐ | ☐ | ☐ |

/s/ Spencer Sheehan