EXHIBIT G

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

SAL RIVERA, individually and on
behalf of all others similarly situated,

                  Plaintiff,

        - against -                Class Action Complaint

PERIO INC.,

             Defendant        Jury Trial Demanded

Plaintiff Sal Rivera ("Plaintiff") alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

## I.   MADE IN USA CLAIMS

1. American consumers value buying products made in America.

2. Companies that use unqualified claims that a product is "Made in U.S.A." can mislead consumers when ingredients, components and raw materials used in those products are sourced and/or transformed outside of the United States.

3. Studies show that more than half of consumers are misled by unqualified "Made in U.S.A." claims on products which contains components that originate outside the United States.

4. Moreover, studies have shown consumers will pay more money for products advertised as "Made in U.S.A."

5. The Federal Trade Commission ("FTC") defines "Made in the United

States," and its synonyms, such as "Made in U.S.A.," to mean any unqualified representation, express or implied, that a product, and by extension, the raw materials used in its manufacture, are of domestic origin, not limited to its final assembly, manufacture and formulation. 16 C.F.R. § 323.1(a).

## II.   "MADE IN USA" ACROSS MAP OF UNITED STATES

6.    To meet consumer demand for products made in the United States, Perio Inc. ("Defendant") manufactures and sells shaving cream described as "Made in USA," and "Celebrating 100 Years [of] Made in USA," across a map of the continental United States, under the Barbasol brand ("Product").



7. The back of the can identifies "STEARIC ACID" as the most predominant ingredient after water.



8. This common shaving cream ingredient is made through the acid hydrolysis of triglycerides and is a "waxy lipid [that] softens the skin."[1]

9. When combined with the fourth ingredient of triethanolamine ("TEA"), a thickener and wetting agent, which "allows water to flow more freely by reducing the surface tension that holds droplets together," stearic acid "becomes a powerful thickener for luxurious lather."

10. Though stearic acid is sometimes used on its own, it is primarily an intermediary oleochemical in a range of industries, including personal care or cosmetics.

## III.  STEARIC ACID ORIGINS

11. Stearic acid is obtained from animal and plant sources.

12. When stearic acid is obtained from animal sources, the raw material is

---

[1] https://www.ewg.org/news-insights/news/whats-my-shaving-cream

tallow, or beef fat.

13.   When stearic acid is obtained from plant sources, the raw material is usually, but not always, palm oil.

14.   Palm oil is one of the world's most controversial crops.

15.   Palm oil is an "extremely versatile oil that has many different properties and functions that makes it so useful and so widely used."[2]

16.   Studies have reported that half of all products in supermarkets contain palm oil, whether food, personal care product, or something not consumed or applied to the body.[3]

17.   Palm oil produces forty percent of global vegetable oil while cultivated on six percent of land used to produce all vegetable oils.

18.   To produce an equivalent amount of oil from soybeans, coconuts, sunflowers or rapeseed would need between four and ten times the amount of land.

19.   Unfortunately, "Palm oil has been and continues to be a major driver of deforestation of some of the world's most biodiverse forests, destroying the habitat of already endangered species."

20.   This is accompanied by "conversion of carbon rich peat soils [that] are throwing out millions of tons of greenhouse gases into the atmosphere and

---

[2] https://www.wwf.org.uk/updates/8-things-know-about-palm-oil
[3] https://www.chesterzoo.org/what-you-can-do/our-campaigns/sustainable-palm-oil/what-is-palm-oil/

contributing to climate change."

21.   Environmental advocates seeking to prevent this destruction have sought to draw the public's attention to the ubiquity of palm oil in everyday products.

22.   They contend that "Palm oil is often disguised, hidden behind many different ingredient names you probably don't recognize when you go to your pantry or bathroom to check."[4]

23.   These groups, including the Orangutan Foundation International ("OFI"), assert that "there are hundreds of chemical names for palm oil derivatives," and that stearic acid is "definitely palm oil or derived from palm oil."[5][6]

## IV.   FACTORS IN STEARIC ACID PRODUCTION

24.   The source of stearic acid, whether from palm oil or other inputs, or the country it is manufactured in, is based on several considerations.

25.   These factors support the conclusion that the stearic acid used in the Product is not made in the United States, or if it is, the raw materials it uses are not obtained domestically.

26.   First, the main source of stearic acid is palm oil, followed by coconut oil, rapeseed oil and soybean oil.

---

[4] Ashley Schaeffer Yildiz, Palm Oil's Dirty Secret: The Many Ingredient Names For Palm Oil.
[5]https://drpongo.files.wordpress.com/2012/01/productpalmoillist2012flexweek.pdf; https://www.worldwildlife.org/pages/which-everyday-products-contain-palm-oil
[6] https://orangutan.org/wp-content/uploads/2017/02/3waystoboycottpalmoil.pdf

27.   Second, palm oil and coconut oil, the predominant inputs for stearic acid, are not produced in the United States.

28.   Third, Indonesia and Malaysia are the world's largest manufacturers of stearic acid, based on their abundance of palm oil and coconut oil.[7]

29.   Fourth, Indonesia and Malaysia supply over 90 percent of United States imports of stearic acid.

30.   Fifth, the food and personal care industries mainly use stearic acid derived from plant sources.

31.   This is due to historical concerns about transmission of disease and consumer preference for products based on plant, as opposed to animal sources.

32.   Sixth, although the United States produces stearic acid domestically, the raw material used is mainly tallow.

33.   The main usage of this form of stearic acid is in metal stearate manufacturing.[8]

34.   Seventh, domestic production of stearic acid, from between seven and eleven companies, has decreased over the past decade.[9]

_____

[7] https://oec.world/en/profile/bilateral-product/stearic-acid/reporter/idn
[8] Competitive Need Limitation (CNL) Waiver: Stearic Acid (Indonesia), Ch. 3 at 25, United States International Trade Commission ("USITC"), Generalized System of Preferences: Possible Modifications, 2018 Review, Publication Number: 4972 Investigation Number: 332-572 September 2019
[9] Major domestic producers of stearic acid are in Illinois, Massachusetts, New Jersey, Ohio, Tennessee, and Texas.

35.  This is partly from competing demands for soybean oil, such as tax credits promoting its usage in biodiesel fuel.

36.  Eighth, the decline of domestically produced stearic acid has caused more stearic acid to be sourced abroad, due to higher production and lower prices.

37.  Ninth, though domestic companies produce stearic acid exclusively from vegetable sources, this often is based on palm oil and coconut oil.

38.  For example, in producing stearic acid, the non-tallow raw materials used by Twin Rivers Technologies, a Massachusetts firm, are almost exclusively coconut oil and palm oil, with a sliver allocated to soybean oil, capable of being produced domestically.[10]



39.  Another leading domestic oleochemical manufacturer, VVF LLC,

---

[10] Twin River Technologies, Sustainability Report, 2019.

promotes its line of fatty acids like stearic acid as "Derived From Palm Oil, Palm Kernel Oil and Mustard Oil."[11]

40.   As mustard oil is produced and used in small amounts and for purposes distinct from palm oil and the personal care industry, it is reasonable to conclude most of VVF's stearic acid is from palm oil.

41.   PMC Biogenix, Emery Oleochemicals and Vantage Oleochemicals, global producers with factories in Ohio, Illinois, and Massachusetts, manufacture various types of stearic acid.[12]

42.   Most are based on tallow, intended for sources other than the personal care industry.

43.   For their non-tallow stearic acid production, they rely heavily on palm oil and coconut oil.[13]

44.   The Procter & Gamble Company, one of the world's largest sellers of personal care products, manufactures a significant amount of fatty acids, including stearic acid.

45.   While most of what P&G manufactures is for its own use, a significant amount is sold to other companies.

---

[11] https://www.vvfllc.com/FattyAcids.html

[12] Emery Oleochemicals, OleoBasics, Product Portfolio brochure.

[13] PMC Group N.A., Inc., Roundtable on Sustainable Palm Oil ("RSPO"), Annual Communication of Progress ("ACOP"), 2022.

46.  Sources indicate these fatty acids are based almost entirely on coconut oil and palm oil.

47.  Tenth, investigation has identified one American company which produces stearic acid entirely from soybean oil, but this is used as a food additive, not in personal care products.

48.  Eleventh, it is commercially challenging, if not impossible, to source significant amounts of consistent quality and low-priced palm oil-free stearic acid.[14]

49.  Even where stearic acid is made without palm oil, its source is coconut oil, which is not produced domestically.

50.  Where palm oil and coconut oil are not used, the sources will be rapeseed oil, soybean oil or sunflower oil.

51.  However, these oils are substantially more unsaturated than palm oil, with different physical properties.[15]

52.  Moreover, such alternatives are significantly more expensive, making global manufacturers unlikely to switch.

53.  Using these palm oil alternatives would require personal care products be reformulated, involving addition of other ingredients, such as viscosity modifiers, significantly increasing costs and changing product characteristics consumers have

---

[14] https://www.lush.com/us/en_us/i/stearic-acid-from-olive-oil
[15] Parsons, Sophie, Sofia Raikova, and Christopher J. Chuck. "The viability and desirability of replacing palm oil." Nature Sustainability 3.6 (2020): 412-418.

come to rely on.

## V.   CONCLUSION

54.   Through its "Made in USA" representation and claim that it is has been "Made in USA" for 100 years, consumers will expect that all raw materials, components, and/or ingredients used in the Product are sourced, grown, harvested, etc., within the United States.

55.   However, based on available inputs and industry practices, the stearic acid used in the Product consists of raw materials sourced outside the United States.

56.   The FTC considers it a deceptive practice to label a product as Made in the United States unless (1) the final assembly or processing of the product occurs in the United States, (2) all significant processing that goes into the product occurs in the United States, and (3) all or virtually all ingredients or components of the product are made and sourced in the United States. 16 C.F.R. § 323.2.

57.   Even accepting that the shaving cream is manufactured at domestic facilities, and stearic acid is made domestically from palm oil or coconut oil, "Made in USA" is misleading and false because not "all or virtually all" of this ingredient's raw materials or components are sourced in the United States.

58.   To the extent tropical oils such as palm oil or coconut oil are substantially transformed in the United States, "Made in USA" is not qualified to avoid consumer deception about the presence or amount of foreign materials used in the shaving

cream.

59.   Reasonable consumers do not understand "Made in USA" to refer only to the transformation of components into the shaving cream they buy, at American factories, by American workers.

60.   Instead, consumers will also expect the raw materials used to originate domestically when this is not true.

61.   As a result of the false and misleading representations, the Product is sold at a premium price, approximately $2.49 for 10 oz, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## JURISDICTION

62.   Plaintiff is a citizen of Florida.

63.   Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

64.   The aggregate amount in controversy exceeds $5 million, including any statutory or punitive damages, exclusive of interest and costs.

65.   Defendant is a citizen of Ohio based on its corporate formation and principal place of business.

66.   The class of persons Plaintiff seeks to represent includes persons who are citizens of a different state from which Defendant is a citizen.

67. The members of the proposed class Plaintiff seeks to represent are more than one hundred, because the Product has been sold at hundreds of retail stores in this State, such as grocery stores, big box stores, drug stores, convenience stores, gas stations, warehouse club stores, and/or online, to citizens of this State.

68. The Court has jurisdiction over Defendant because it transacts business within Florida and sells the Product to consumers within Florida from grocery stores, big box stores, drug stores, convenience stores, gas stations, warehouse club stores, and/or online, to citizens in this State.

69. Defendant transacts business in Florida, through the sale of the Product to consumers within Florida from grocery stores, big box stores, drug stores, convenience stores, gas stations, warehouse club stores, and/or online, to citizens in this State.

70. Defendant has committed tortious acts within this State through the distribution and sale of its the Product to consumers within Florida from grocery stores, big box stores, drug stores, convenience stores, gas stations, warehouse club stores, and/or online, to citizens in this State.

71. Defendant has committed tortious acts outside this State by manufacturing, labeling, representing and selling the Product in a manner which causes economic injury to consumers within this State by misleading them as to its attributes, characteristics, contents, amount and/or quality, by regularly doing or

soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in this State, and/or derives substantial revenue from the sale of the Product to consumers in this State.

72.   Defendant has committed tortious acts outside this State by manufacturing, labeling, representing and selling the Product in a manner which causes economic injury to consumers within this State by misleading them as to its attributes, characteristics, contents, amount and/or quality, by regularly doing or soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in this State, such that it expects or should reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or international commerce.

## VENUE

73.   Plaintiff resides in Hillsborough County.

74.   Venue in the Tampa Division of this District is based on Plaintiff's residence in Hillsborough County.

75.   Venue is based on Plaintiff's residence in Hillsborough County because a substantial or the entire part of the events or omissions giving rise to his claims occurred in Hillsborough County, including his purchase of the Product based on the representations and omissions identified here.

76.   Venue is based on Plaintiff's residence in Hillsborough County because

this is where his causes of action accrued, including his purchase, payment of money for or towards, use and/or consumption of the Product.

77.   Plaintiff purchased, paid money for or towards, used and/or consumed the Product in reliance on the representations and omissions identified here in Hillsborough County.

78.   Plaintiff first became aware the representations and omissions were false and misleading in Hillsborough County.

## PARTIES

79.   Plaintiff Sal Rivera is a citizen of Hillsborough County, Florida.

80.   Defendant Perio Inc. is an Ohio corporation with a principal place of business in Ohio.

81.   Plaintiff is like most purchasers of all consumer goods, who looks at the packaging before he makes his purchase.

82.   Plaintiff prefers, where possible, to buy products made in the United States.

83.   Plaintiff seeks to support American industries, American workers and American products.

84.   Plaintiff read, saw and relied on the statements of "Made in USA" across a map of the continental United States on the front of the can.

85.   Plaintiff understood this unqualified "Made in USA" claim to mean the

Product's components were not only combined in the United States, but that the raw materials it used were sourced here and not abroad.

86. Plaintiff purchased Original Barbasol Shaving Cream promoted as "Made in USA" across a map of the continental United States on the front of the can, made by Defendant, with the labeling and marketing identified here, at grocery stores, big box stores, drug stores, convenience stores, gas stations, warehouse club stores, and/or online, in Hillsborough County, between January 2020 and January 2024.

87. Plaintiff bought the Product at, around or exceeding the above-referenced price.

88. Plaintiff paid more for the Product than he would have had he known all its raw materials were not sourced in the United States.

89. The Product was worth less than what Plaintiff paid, and he would not have bought it or paid as much absent Defendant's false and misleading statements and omissions.

## CLASS ALLEGATIONS

90. Plaintiff seeks to represent the following class:

> All persons in Florida who purchased
> Barbasol Original Shaving Cream
> represented as "Made in USA" across a map
> of the continental United States on the front
> of the can, in Florida, during the statutes of
> limitations for each cause of action alleged.

91.    Excluded from the Class are (a) Defendant, Defendant's board members, executive-level officers, and attorneys, and immediate family members of any of the foregoing persons, (b) governmental entities, (c) the Court, the Court's immediate family, and Court staff and (d) any person that timely and properly excludes himself or herself from the Class.

92.    Common questions of issues, law, and fact predominate and include whether Defendant's representations and omissions were and are misleading and if Plaintiff and class members are entitled to damages.

93.    Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

94.    Plaintiff is an adequate representative because his interests do not conflict with other members.

95.    No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

96.    Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

97.    The class is sufficiently numerous and likely includes several thousand people.

98.    This is because Defendant sells the Product to consumers from hundreds

of stores and online in the State Plaintiff is seeking to represent.

99. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

## CAUSES OF ACTION

### COUNT I
Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"),
Fla. Stat. § 501.201, *et seq.*

100. Plaintiff incorporates by reference paragraphs 1-61.

101. The purpose of FDUTPA is "To protect the consuming public…from those who engage in…deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

102. This includes "making state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(3).

103. FDUTPA considers any "unfair or deceptive acts or practices in the conduct of any trade or commerce [to be] unlawful." Fla. Stat. § 501.204(1).

104. Such "unfair or deceptive acts or practices" must be construed so that "due consideration and great weight shall be given to the interpretations of the FTC and the federal courts relating to [the FTC Act,] 15 U.S.C. § 45(a)(1)." Fla. Stat. § 501.204(2).

105. Violations of FDUTPA can be based on other laws and standards related

to consumer deception. Fla. Stat. § 501.203(3).

106. An FDUTPA violation occurs whenever "Any rules promulgated pursuant to the FTC Act, 15 U.S.C. § 41 *et seq*." are violated. Fla. Stat. § 501.203(3)(a).

107. An FDUTPA violation occurs whenever "The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission ('FTC') or the federal courts" relating to the FTC Act are violated. Fla. Stat. § 501.203(3)(b).

108. An FDUTPA violation occurs whenever "Any law, statute, rule, regulation, or ordinance which proscribes…unfair, deceptive, or unconscionable acts or practices" is violated. Fla. Stat. § 501.203(3)(c).

109. In considering whether advertising is misleading in a material respect, the FTC Act recognizes that the effect of advertising includes not just representations made or suggested by words and images, "but also the extent to which [it] fails to reveal facts material in the light of such representations." 15 U.S.C. § 55(a)(1).

110. The FTC defines "Made in the United States," and its synonyms, such as "Made in U.S.A.," to mean any unqualified representation, express or implied, that a product, and by extension, the raw materials used in its manufacture, are of domestic origin. 16 C.F.R. § 323.1(a).

111. The FTC considers it a deceptive practice to label a product as Made in the United States unless (1) the final assembly or processing of the product occurs

in the United States, (2) all significant processing that goes into the product occurs in the United States, and (3) all or virtually all ingredients or components of the product are made and sourced in the United States. 16 C.F.R. § 323.2.

112. Based on FTC regulations, which are based on consumer research, it is misleading to label a product with an unqualified "Made in USA" claim where the raw materials originate outside of the United States.

113. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

114. This is because consumers prefer, where possible, to buy products made in the United States.

115. The marketing of the Product as "Made in USA" violated the standards of unfairness and deception set forth and interpreted by the FTC, because it concluded consumers will not understand "nuanced" explanations that "Made in USA" is only intended to mean the final product was assembled or created domestically. Fla. Stat. § 501.203(3)(b).

116. The marketing of the Product as "Made in USA" violated laws, statutes, rules, regulations, or ordinances "which proscribe[]…unfair, deceptive, or unconscionable acts or practices," because representing a product with this unqualified claim when all or substantially all of its raw materials, components and/or ingredients originated abroad was a deceptive act, thereby violating

FDUTPA. Fla. Stat. § 501.203(3)(c); 15 U.S.C. § 45(a)(1)

117. The labeling of the Product violated FDUTPA because representing it as "Made in USA" across a map of the continental United States on the front of the can, when it included raw materials sourced abroad was an unfair or deceptive act or practice. Fla. Stat. § 501.204(1).

118. The labeling of the Product violated FDUTPA because this State recognized that "in construing subsection (1), due consideration and great weight shall be given to the interpretations of the [FTC] [] relating to s. 5(a)(1) of the FTC Act." Fla. Stat. § 501.204(1).

119. The FTC affirmed that consumers understand unqualified "Made in USA" claims to mean a product's raw materials were sourced domestically, which means the practice employed by Defendant is deceptive and unfair to consumers.

120. Plaintiff believed the Product was not only assembled or manufactured in the United States but that its components, ingredients and raw materials used were sourced domestically, because he was unaware of industry practices or the global sourcing of industrial ingredients, raw materials and components.

121. Plaintiff paid more for the Product and would not have paid as much if he knew that it was not "Made in USA," because it contained ingredients, components or raw materials that were sourced abroad.

122. Plaintiff seeks to recover for economic injury and/or loss he sustained

based on the misleading labeling, marketing and packaging of the Product as "Made in USA," a deceptive practice under FDUTPA, by paying more for it than he otherwise would have.

123. Plaintiff will produce evidence showing how he and consumers paid more than they otherwise would have paid for the Product, relying on Defendant's representations and omissions, using statistical and economic analyses, hedonic regression, hedonic pricing, conjoint analysis and other advanced methodologies.

**COUNT II**
**False and Misleading Adverting,**
**Fla. Stat. § 817.41**

124. Plaintiff incorporates by reference paragraphs 1-61.

125. Defendant made misrepresentations and omissions of material fact, that it was "Made in USA" across a map of the continental United States on the front of the can, through its advertisements and marketing in various forms of media, product packaging and descriptions, and/or targeted digital advertising.

126. Defendant failed to truthfully disclose that even though the Product was manufactured, assembled and/or formulated in the United States, it used ingredients, components and/or raw materials that were sourced from abroad.

127. Defendant falsely and/or deceptively stated and/or implied the Product was "Made in USA" across a map of the continental United States on the front of the can, and that its components, ingredients and/or raw materials originated in this

country, even though this statement only referred to its assembly, manufacture and/or production.

128. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions, because, where possible, consumers seek to buy products made in the United State.

129. Defendant knew these statements and omissions were false and/or misleading.

130. Defendant intended for consumers to rely on its false statements and omissions for the purpose of selling the Product.

131. Plaintiff and class members did in fact rely upon these statements and omissions.

132. Reliance was reasonable and justified because of the public trust placed in companies, especially iconic brands, which make claims their products were "Made in USA," as consumers expect them to be marketed truthfully and in a non-misleading manner.

133. Plaintiff paid more for the Barbasol Original shaving cream represented as "Made in USA" across a map of the continental United States on the front of the can, as he would not have paid as much or bought it if he knew that its ingredients, components and/or raw materials were sourced outside the United States.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

 **WHEREFORE**, Plaintiff prays for judgment:

1.  Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2.  Awarding monetary damages and interest;

3.  Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4.  Other and further relief as the Court deems just and proper.

Dated:   February 8, 2024

Respectfully submitted,

/s/ William Wright
The Wright Law Office P.A.
515 N Flagler Dr Ste P300
West Palm Beach FL 33401
(561) 514-0904
willwright@wrightlawoffice.com

*Notice of Lead Counsel Designation:*

*Lead Counsel for Plaintiff*

William Wright

The Wright Law Office P.A.

Spencer Sheehan*
Sheehan & Associates P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com

*Pro Hac Vice* Application Forthcoming

*Counsel for Plaintiff*